Hillsborough,
No. 4932.

ROGER H. CHAGNON

*v.*

UNION-LEADER CORPORATION.

Argued June 20, 1961.
Decided October 27, 1961.

*Craig & Craig* and *McLane, Carleton, Graf, Greene & Brown* and *David L. Nixon* (*Mr. Brown* orally), for the plaintiff.

*Fuller, Flynn & Riordan* and *Welch, Mott & Morgan* and *Herbert E. Forrest* (of Washington, D. C.) (*Messrs. Flynn* and *Morgan* orally), for the defendant.

LAMPRON, J. Defendant maintains that (1) plaintiff failed to establish or sustain his case; (2) it established a complete defense to the action; (3) the Trial Court admitted certain incompetent evidence; (4) a mistrial should have been ordered because the foreman of the jury was not indifferent; (5) the Trial Court erred in its instructions to the jury relative to cheating and malice; (6) the verdict was against the law and the evidence and was grossly excessive.

The first promotional advance notice of an article concerning the plaintiff appeared in the Union-Leader on July 3, 1954. The article published the next day in the Sunday News was under the following headline: "Says Trees At New Lot Below Par." It read in part as follows: "Shrub trees of an 'inferior species' failing to meet specifications under a contract given by the city to Chagnon Garden Center of Manchester, are being planted at the new Merrimack Common parking lot, it was charged last night by leading New Hampshire nurserymen.

"The Chagnon Garden Center is owned and operated by Roger H. Chagnon, brother of Romeo Chagnon, a Manchester Highway commissioner.

"The . . . contract . . . calls for the planting of 410 'columnaris arbor vitae trees, six feet tall' . . .

"Leon Pearson, prominent locally in nurserymen's circles, told the Sunday news last night that, in his opinion, the trees being planted 'are not columnaris arbor vitae, but run-of-the-mill nigra shrubs.'

"Other nurserymen . . . concurred with Mr. Pearson, who examined the trees personally.

" 'Nigra shrubs' it was explained by Mr. Pearson 'are much more plentiful than columnaris and can be obtained much more easily and much more reasonably. The difference in cost would be substantial.'

"Mr. Chagnon . . . denied stoutly that he had substituted 'an inferior species' or that any of the trees planted do not meet size specifications and all other standards.

"On the other hand, Winthrop Sterling, official Manchester Water Works gardener, in charge of passing on the tree standards, refused to give a 'yes' or 'no' answer to the question of whether the shrubs being planted by Mr. Chagnon's firm are columnaris, as specified.

"Mr. Sterling, who said he rejected 'more than 100' trees delivered by . . . Chagnon . . . because they did not in his judgment meet standards, admitted that 'many of the trees planted are five footers' and do not come close to meeting the six-foot height specification.

" 'But that isn't my fault . . . I'm just a city employee taking orders, and found myself right in the middle. I didn't know but what there may have been a deal cooking' he said.

" . . . Joseph Mezitt, proprietor of Weston Nurseries . . . low bidder on the job, had plenty of figures ready.

" 'I offered to furnish everything needed — with the exception of a few plants — for $4,660 substituting nigra for columnaris.' [Chagnon's bid was $5,790 according to this article of which $3,587.50 was for 410 trees, viz: $8.75 per tree]

"Weston Nurseries underbid Chagnon Garden Center by $1,130. . . .

"[A local nurseryman said] 'Anyone can underbid if they want to supply run-of-the-mill stock. I defy anyone to produce 410 columnaris trees, six feet tall, full throughout, for anything like $8.75 each. It can't be done.' "

A second promotional notice appeared in the Union-Leader July 10 reading "Those sub-par shrub trees in Merrimack Common." The following day a second article was published in the Sunday News under the following headline "Supplying Firm Says Trees 'Nigra' Species." In addition to repeating some of the statements previously printed it read in part as follows: "The Cromwell Conn. nursery that furnished shrubs to . . . Chagnon . . . for sale

to the city . . . confirmed last night that the trees are of the 'occidentalis nigra' species.

"Roger H. Chagnon . . . denied last week that the species of the shrubs being planted was nigra, or that they did not meet size specifications which called for trees 'six feet high.'

"In the same statement identifying the shrubs as nigra — in spite of Mr. Chagnon's assertion they were not — the Cromwell nursery superintendent [Mr. Webster] revealed to the Sunday News that invoices in his office showed the Manchester landscaper ordered the nigra shrubs 'five to six feet high.'

"Mr. Webster explained that, in order for Mr. Chagnon to have insured getting 400 trees 'six feet high' it would have been necessary for him to order shrubs with a specified size of 'six to seven feet.' The per tree difference in cost would have been substantial, he said.

"[Chagnon's bill] will not be paid according to Manchester Finance Committee Chairman Percy Bennett, until landscaper Chagnon secures a statement from the Pierson Nursery that the shrubs are not of the nigra species, but straight columnaris arbor vitae, as called for by specifications.

"Chairman Bennett told a reporter that Mr. Chagnon had 'refused to reveal the source of his supply' to T. Edward McIntyre, superintendent of Parks and Playgrounds, or to show him the invoices for the trees.'

"'I can understand his possible unwillingness to show the invoices' Bennett said. 'But I can't see why Mr. McIntyre should not be allowed to learn from Mr. Chagnon the source of his supply. We're watching this case.'"

The article reiterated that Weston Nurseries which offered the city nigra shrubs was the low bidder for the work.

A third article appeared in the Sunday News on July 18 entitled "Tree Job Leads to Many Claims." It reads in part as follows: "There were new developments on all fronts this week in the case involving the Chagnon Garden Center, the local firm supplying allegedly sub-par shrub trees being planted at the new Merrimack Common parking lot.

"Developments were: (1) The revelation that Mayor Josaphat T. Benoit and City Clerk Michael Quinn have been served with trustee writs resulting from action brought by individuals seeking to collect a total of $14,324.31 from Roger H. Chagnon. . . .

"In addition to trustee writs served on the mayor and city clerk against Chagnon to attach the $5,790 check due him from the city,

provided the bill is not held up, City Treasurer James F. Bourne was notified that the Amoskeag bank had received an assignment of $5,790 from Mr. Chagnon.

"Treasurer Bourne, who acknowledged notification of the assignment by signing it, keeping a carbon copy, said it was, in effect, another writ. . . .

"Brother Not Involved.

"Meanwhile, Manchester Highway Commissioner Romeo Chagnon, in a statement to the Sunday News disclaimed 'any part in the award of the tree job to my brother. I did not bring any influence whatever to bear on anybody.' "

The promotional notice published in the Union-Leader of July 24 read "More on Parking Lot Tree Mess." The article which appeared in the Sunday News the next day was entitled "Refuse to Release Report on Trees in Parking Lot" and read in part as follows: "Percy H. Bennett, Chairman of the Manchester Finance Commission, refused last night to release a report filed by Leon Pearson, leading local nurseryman, in connection with shrub trees furnished to the city by the Chagnon Garden Center for planting at Merrimack Common parking lot.

"However, City Hall sources . . . told the Sunday News that, according to the Pearson report, not one of the nearly 300 shrub trees planted thus far meets specifications. The specifications call for columnaris arbor vitae trees with a minimum height of six feet.

"The Pearson report claimed also, it was reported, that a large number of miscellaneous plants furnished by Chagnon under a $5,790 city contract also fails to meet specifications as to size and quality."

On August 1, the Sunday News carried its fifth front page story in this matter. It read in part as follows: "Municipal officials had gone mum over the case through the week, but George Langlois, Chairman of the Parks and Playgrounds Commission, admitted yesterday that Roger H. Chagnon had been summoned to a hush-hush meeting.

"Chagnon is owner of Chagnon Garden Center, Manchester, and furnished the city hundreds of trees and miscellaneous other plants, which according to experts, do not meet specifications under a $5,790 contract."

By a letter dated August 23, 1954 Chagnon was advised "that the Parks and Playground Commission elects to rescind the sale

as to the trees referred to above. [410 Arborvitae Columnaris, size 6']" He brought suit against the city for breach of contract and obtained a verdict.

"Any written words which directly or indirectly charge a person with a crime, or which tend to injure his reputation in any other way, or to expose him to public hatred, contempt, or ridicule, are defamatory. Such words, if published without lawful excuse or justification, constitute a libel, and the person in respect to whom they are written may maintain an action for them without either alleging or proving special damages." *Richardson* v. *Thorpe*, 73 N. H. 532, 534; Restatement, Torts, ss. 559, 569.

A publication may be defamatory on its face or it may carry a defamatory meaning only by reason of extrinsic circumstances. In the latter case "the plaintiff has the burden of pleading and proving such facts, by way of what is called 'inducement.' Likewise, he must establish the defamatory sense of the publication with reference to such facts, or the 'innuendo.'" Prosser, Torts (2d *ed.*) s. 92, *p*. 582.

"The function of the innuendo is merely to explain the words in the light of the facts. No mere claim of the plaintiff can add a defamatory meaning where none is apparent from the publication itself in the light of the inducement; and it remains a question for the court whether the meaning claimed might reasonably be conveyed, and for the jury whether it was so understood." *Id.*; *Richardson* v. *Thorpe, supra*; *Blanchard* v. *Claremont Eagle,* 95 N. H. 375, 378; Restatement, Torts, *s*. 563, *comment* f.

In considering whether plaintiff's declaration stated a cause of action for defamation the words used in the articles are to be considered together with their context and must be taken in the sense in which they are reasonably understood under the circumstances by persons familiar with the language used. *Robinson* v. *Keyser,* 22 N. H. 323, 324; Restatement, Torts, *s*. 563, *comment* c.

Defendant takes the position that "under no reasonable construction . . . could the words in the articles complained of be capable of the meaning which plaintiff sought to ascribe to them by the innuendoes in the declaration, so that there was no question for the jury to determine. Accordingly, the declaration failed to state a cause of action upon which relief could properly be granted; the motion of defendant to strike the allegations and other matters set forth in plaintiff's declaration as innuendoes should have been granted; and the case should have been dismissed."

The plaintiff set out in his declaration the following words used by the defendant in its articles or promotional advertisements as being defamatory. "Parking Lot Landscape Job in Hot Water"; "Says Trees At New Lot Below Par, by James Stack"; "The Chagnon Garden Center is owned and operated by Roger H. Chagnon, brother of Romeo Chagnon, a Manchester Highway Commissioner"; "Those sub-par trees in Merrimack Common"; "Parking Lot Dispute, Supplying Firm Says Trees Nigra Species, by James Stack"; "Weston Nurseries, Weston, Mass. offered the City Nigra shrubs in a sealed proposal of $4,660 . . . $1,130 less than the Chagnon bid of $5,790, Weston was low bidder"; "More on parking lot tree planter"; "Tree Job Leads to Many Claims, by James Stack; Presumably the Finance Commission will use the Pearson report to weigh the question of honoring the Chagnon bill when it is presented for payment"; "More on Parking Lot Tree Mess"; "Refuse to Release Report on Trees on Parking Lot. The Pearson report claimed also, it was reported, that a large number of miscellaneous plants furnished by Chagnon under a $5,790 City contract also fail to meet specifications as to size and quality"; "Parking Lot Trees Case Unsettled."

The plaintiff by innuendoes in his declaration attributed the following defamatory meaning to these words. The trees being furnished by the plaintiff under his contract were of a species inferior to that called for in his contract and were improper. Weston Nurseries being the low bidder, plaintiff wrongfully and fraudulently obtained the contract with the city of Manchester probably through the use of unlawful influence by his brother. The trees and shrubs which plaintiff supplied were of an inferior grade and he knowingly and unscrupulously furnished inferior stock and that is the reason why the city has refused to pay him therefor.

Taking in consideration all the circumstances under which these words were written, their context, the meaning which could reasonably be given to them by the readers, we are of the opinion that it could be found that the words in defendant's articles complained of were understood in the sense stated in the innuendoes. Defendant's motion to strike out certain parts of plaintiff's declaration and to dismiss the case before trial was properly denied. *Gendron* v. *St. Pierre*, 73 N. H. 419; *Catalfo* v. *Shenton*, 102 N. H. 47.

Defendant maintains further that the Trial Court erred in permitting divers witnesses to testify as to how they understood the

articles, as to their understanding after they spoke to other persons and in instructing the jury that their testimony could be considered in determining whether the articles were defamatory. Defendant claims that all of the words of the articles, whether read singly or considered as a whole, are reasonably plain, clear and unambiguous, with commonly accepted and understood meanings and connotations, and that there were no extrinsic facts or circumstances justifying the admission of the testimony of these witnesses.

Plaintiff had the burden of proving that the statements which the defendant published about him reasonably understood by the readers were defamatory of him and also the extent of the damage which they caused. *Smart* v. *Blanchard,* 42 N. H. 137, 147; *Richardson* v. *Thorpe,* 73 N. H. 532, 534; *Blanchard* v. *Claremont Eagle,* 95 N. H. 375, 378. To that end plaintiff set out in his declaration by way of inducement certain prefatory matters, particularly the existence of the contract with the city, and by innuendo an explanation of the words used by the defendant which could give them a defamatory meaning.

Defendant has argued that the words used in the articles were capable of a nondefamatory interpretation. Plaintiff contends and we have already stated that we are also of the opinion that these same words could be found to have a defamatory meaning. It has been the rule in New Hampshire for a century that where words are ambiguous the testimony of hearers or readers thereof as to how they understood them can be received. *Smart* v. *Blanchard,* 42 N. H. 137, 146-150; *Moore* v. *Butler,* 48 N. H. 161, 167; *Shaw* v. *Shaw,* 49 N. H. 533. The witnesses were persons to whom the alleged libel was published and they were testifying to their understanding of the words in the articles. This was material evidence on the issue of whether the words used were reasonably understood by the readers to be defamatory of the plaintiff and the Court gave proper cautionary instruction as to the use of this evidence. *Shaw* v. *Shaw, supra,* 534.

The Trial Court also allowed witnesses to testify that other people were making statements as to their understanding of the publications and whether these statements caused any change in the witnesses' own understanding of what the articles purported to say. We are of the opinion that this evidence was admissible to establish the extent to which these articles were read in the community and the effect which they produced. *American Employers Ins. Co.* v. *Wentworth,* 90 N. H. 112, 116, 117; *Emery* v.

*Woodward,* 96 N. H. 61, 62; *Mattox* v. *News Syndicate Co.,* 176 F. 2d 897 (2d Cir. 1949) cert. denied 338 U. S. 858 (1949). This evidence also tended to show that the witnesses' interpretation of the words used was not bizarre or strained.

In defense defendant relied on justification, conditional privilege and privileged criticism.

Justification is established if the facts alleged were true and were published with a justifiable motive. *Palmer* v. *Concord,* 48 N. H. 211, 217; *Hutchins* v. *Page,* 75 N. H. 215. It would serve no useful purpose to attempt to review the voluminous record of this case in this opinion. A reading thereof however leads to the conclusion that the jury could find on the evidence that the publications made by the defendant were reasonably understood by readers thereof to state that Chagnon did in fact supply to the city a cheaper and inferior species of trees than those called for by his contract and that he did this knowingly and for the purpose of cheating the city.

The specifications called for "410 Arborvitae Columnaris, Size 6'." The jury could find on the evidence that the trees supplied by Chagnon were "Thuja Occidentalis Fastigiata." Also that "Arborvitae" is the common word used to include all species and varieties of the genus "Thuja" including the species "Thuja Occidentalis" of which "Fastigiata" is a variety. The jury could also find that "Fastigiata" denotes a columnar tree which is the variety of "Arborvitae" or "Thuja Occidentalis" the city was seeking by the word "Columnaris" in the specifications. There was also evidence which would warrant a finding that a tree of the five to six foot size under the standards of the American Nursery Association would be the proper size tree to produce a screening hedge six foot in height as shown on the drawings furnished to the city by the consultant who drew the specifications for this project. The jury could also find that trees of the variety "Nigra" are not of an inferior variety to those of the "Columnaris" variety.

Although it is not necessary for the defendant to prove the literal truth of a defamatory statement in every detail but only that it is substantially true we cannot say as a matter of law that the defendant met that burden in this case. The jury could find on the evidence that the defamatory statements published by the defendant were untrue. *State* v. *Burnham,* 9 N. H. 34, 42; *Emde* v. *San Joaquin County &c. Council,* 23 Cal. 2d 146; Restatement, Torts, *s. 582, comment* e; Prosser, Torts (2d *ed.*)*s.* 96, *p.* 632.

Even though a defendant cannot justify the publication because it can be found to be untrue he may excuse it by showing it was privileged. A conditional privilege, which is what is claimed here, is established if the facts, although untrue, were published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds of its truth. *Carpenter* v. *Bailey*, 53 N. H. 590, 595; *Lafferty* v. *Houlihan*, 81 N. H. 67. However if a defamatory statement is made with actual malice it cannot be excused as privileged. *State* v. *Burnham, supra; Hutchins* v. *Page*, 75 N. H. 215, 216.

The Trial Court charged the jury as to what constitutes malice in the following words: "by malice I mean not only ill will, evil motive or intention to injure but also a wanton disregard of the rights of others and the consequences likely to follow." We are of the opinion that this was a proper statement of the applicable law. *Hoeppner* v. *Dunkirk Printing Co.*, 254 N. Y. 95; *Petition of Retailers Commercial Agency*, 174 N. E. 2d 376, 380 (Mass. 1961); *Dun & Bradstreet* v. *Robinson*, 345 S. W. 2d 34 (Ark. 1961); *Shapiro* v. *Health Insurance Plan*, 7 N. Y. 2d 56.

The record contains the following evidence on the issue of malice. Stack, the Sunday News reporter who wrote the articles, testified as follows: "Q. Did you recognize at that time that those stories, if published, would have the probable effect of damaging the business reputation of Mr. Chagnon, the man concerning whom you were making the charges? A. Yes, I think it is fair to assume that if you are going to publish a story about a man's business, if that story is going to question . . . his business integrity or his good faith, I think on the face of it, any honest person would recognize that such a story could possibly be damaging." McQuade, the editor of the Sunday News with whom Stack discussed the articles before they were published, testified: "Q. . . . Would you be willing to admit, Mr. McQuade, that that type of publicity would probably harm the business reputation of the landscaper being talked about? A. Yes, I think it probably would tend in that direction."

There was testimony by McQuade that he claimed no competency to determine whether a particular type of arborvitae is or is not designated in a particular contract. Stack testified that he was not familiar with different species of shrubs and did not consult any reference book on the subject.

Stack testified that when he talked on the telephone with Chagnon

on July 3, "Mr. Chagnon denied right at the outset that the trees involved did not meet specifications . . . Mr. Chagnon asked me to hold up on the story until a personal interview could be set up, at which time he could go over the whole thing." Chagnon testified that he "begged" Stack to give him a chance to prove personally that the accusations were false and that Stack told him "he was not interested to find anything on my part." Chagnon also testified that he told Stack "I want to see you personally . . . you are going to damage my business and throw me on the rocks" and that Stack "hung up the line on me."

There was also testimony by Stack as follows: "Q. Let me ask you . . . so far as the protection of the public is concerned, was there any reason why that story could not have been held over for the next week? A. No reason other than that my editor, on the basis of what I gave him, decided it was warranted to print it that week . . . Q. No reason why the story couldn't have been held up long enough so that you could have sat down with Mr. Chagnon. Right? A. There is no reason . . . why that or any other story that appears in a newspaper cannot be held up . . . . "

When asked the reason for, and the effect of, the mention of the name of Romeo Chagnon, as a Manchester highway commissioner and brother of the plaintiff, in his article together with a statement by Sterling that he "didn't know but that there may have been a deal cooking" Stack testified as follows: "Q. The tie-in of a city official, suggesting a deal is on that is going to cost the city money, makes the story more interesting in fact, doesn't it? A. I cannot speak for all the readers of a newspaper but to me it does." There was testimony by a reader of the articles that he understood therefrom "that Roger Chagnon had taken advantage of his brother's position on the Highway Department and attempted to pass trees that might have not met specifications."

When asked about the statement in the first article that Mr. Mezitt of Weston Nurseries was low bidder on the job Stack testified as follows: "Q. Isn't it a fact that as you put this story together you intended to and did indicate that the price Chagnon bid indicated he could not have supplied the proper trees? . . . A. I can't swear that I intended it that way but if I were to read Mr. Mezitt's quote as a reader of the newspaper I would assume, yes, that that inference was there." Mr. Mezitt was quoted in that article as follows: "I offered to furnish everything needed — with the exception of a few plants — for $4,660 substituting nigra

for columnaris." The article also read "Mr. Mezitt explained that the relative scarcity of columnaris of the size and standard specified, would have made the job, 'pretty near $7,000. It would have been impossible to make it less.'" The article stated that the Chagnon bid was $5,790. There was testimony that the article was understood by a reader to mean that Chagnon "tried to cheat the city; tried to put something over."

Some articles contained alleged statements made by Percy Bennett, chairman of the Manchester finance committee which he denied making. The chairman of the parks and playgrounds commission denied that Chagnon was summoned to a "hush hush" meeting as stated in the last article.

We are of the opinion that the jury considering the articles, their language, the manner and circumstances under which they were published could find that they were published with actual malice as defined in the Trial Court's charge which we have here-inbefore approved as stating the applicable law. *Smart* v. *Blanchard*, 42 N. H. 137, 151; *Lafferty* v. *Houlihan*, 81 N. H. 67; *Petition of Retailers Commercial Agency, supra.* Such a finding negatives a defense of privileged communication or criticism. Thayer, Legal Control of the Press (3d *ed.*) *p.* 399.

We are also of the opinion that the foregoing evidence warranted the Court's charge that "a publication which imputes to another a criminal offense constituting a felony is defamatory. Cheating or attempting to cheat or defraud by any false means or false pretense is a felony in this state." See RSA 580:1.

We consider next defendant's exceptions to the denial of its motion for a mistrial made during the trial and to the denial of its motion to set aside the verdict on that ground among others. The situation is set out in its brief to be the following: "The Court was advised during the impanelling of the jury, by the juror who was later to become foreman, that the foreman's son, who was of age and employed [the son was 40 or 45 and a school teacher] had engaged one of plaintiff's attorneys to represent him in a 'driving under the influence' case then pending in Municipal Court, but stated that this would make no difference in his consideration or decision of the case. All counsel expressed satisfaction with the juror, and later interposed no objection to his designation as fore-man. The record also reflects, however, that counsel for defendant did not realize that the son was an unmarried member of the foreman's family who lived at home, and that both counsel for

plaintiff and for defendant thought that the trial of this libel action would be completed before the son was tried in Municipal Court. Instead the trial of the case against the son . . . proceeded during the Christmas recess of the trial of this action, while the foreman of the jury was present as a spectator although speaking with counsel only in connection with bail." The son was found guilty and appealed.

The information conveyed to the Court by the juror when the jury was being impaneled and relayed by it to counsel for the parties was accurate. The juror was not disqualified as a matter of law for interest. *Adams* v. *Severance,* 93 N. H. 289, 293; *McLaughlin* v. *Union-Leader,* 99 N. H. 492, 499. The jury was properly constituted. See *Shulinsky* v. *Railroad,* 83 N. H. 86, 88-89.

We next consider whether the trial was rendered unfair by what transpired in the trial of the son's case during the suspension of the trial of this case. Obviously it would have been preferable if the case had not been tried by counsel engaged in this case and if the foreman of this jury had not been present. *Cloutier* v. *Charland,* 100 N. H. 63, 64. However the Trial Court's denial of defendant's motion for a mistrial on that account and the Court's refusal to set aside the verdict on that ground were equivalent to a finding that the defendant had a fair trial and no reason appears why that finding should be disturbed or the action of the Court set aside. *Perry* v. *Faulkner,* 100 N. H. 125, 127.

We consider defendant's exception to the denial of its motion that the verdict for plaintiff in the amount of $99,000 be set aside because it is against the law and the evidence, the jury were influenced by passion or prejudice or fell into plain mistake, and because the verdict was excessive.

Broadly stated, the plaintiff is entitled to recover such damages as are the natural and direct or proximate result of the publication. 53 C. J. S., Libel and Slander, s. 240, p. 363. When as in this case, the jury could find that the defamatory publication charged the plaintiff with a crime or with activities which would tend to injure him in his trade or business, commonly called libel *per se,* he can recover as general damages all damages which would normally result from such a defamation, such as harm to his reputation. *Id.,* s. 240, p. 363. 1 Harper & James, Law of Torts, s. 5.30, p. 468. He need not prove these damages specifically. Restatement, Torts, s. 621, p. 314.

In addition to the above he is entitled to recover such special

damages as he has proved have resulted and will result in the future as the natural and proximate consequence of defendant's defamatory act. These would include specific harm to his personal reputation in addition to the general harm which would be assumed to result from the libel, harm to his business reputation and credit reputation, loss of business and any other damage which he has proved resulted as the normal and direct consequence of the defamation.

When the element of malice enters into the wrong "the rule of damages is different and more liberal . . . In such cases there enter into the question of damages considerations which cannot be made the subject of exact pecuniary compensation,— such as . . . mental distress and vexation, what in common language might be spoken of as offences to the feelings, insult, degradation, offences against honest pride, and all matters which cannot arise except in those wrongs which are attended with malice." *Bixby* v. *Dunlap*, 56 N. H. 456, 462, 463. The jury is to "endeavor, according to their best judgment, to award such damages by way of compensation or indemnity as the plaintiff on the whole ought to receive and the defendant ought to pay." *Id.,* 464; *Symonds* v. *Carter,* 32 N. H. 458; *Knight* v. *Foster,* 39 N. H. 576; *Fay* v. *Parker,* 53 N. H. 342; *Adams* v. *Strain,* 80 N. H. 90, 91.

Defendant first contends that damages could not be awarded in this case for injury to feelings, for mental anguish, or for personal and public humiliation. The reasons given for its position are that the plaintiff failed to show that probable malice existed; that the "suit was brought not by Roger H. Chagnon in his individual capacity, but solely by Roger H. Chagnon in his capacity as a business entity" and such an entity cannot suffer such damages; that by stipulation at pre-trial plaintiff abandoned any claim to such damages.

We have already decided that there was sufficient evidence from which the jury could find that the publications by the defendant were made with actual malice. It would prolong this opinion unduly without serving any useful purpose to again review that issue at this point.

Plaintiff's declaration alleges that the libels were "of and concerning the plaintiff, and, of and concerning his business as landscaper and nurseryman"; that they were calculated "to bring the plaintiff into hatred, contempt, ridicule or cause him to be shunned or avoided; to injure him in his business" and that "said plaintiff

individually, has been and is greatly injured in his good name, credit and reputation, brought into public scandal and disgrace . . . [that] plaintiff in his capacity as a businessman, has been and is greatly injured in his good name, credit, reputation . . . has been and is injured in his feelings, has been and is caused to suffer great mental anguish, personal and public humiliation, and has been and is otherwise injured."

The plaintiff testified, over objection by defendant but not on the ground now advanced, that after reading the articles published by the defendant "I felt like I was a crook. I didn't have a chance to fight. I didn't have a chance to prove myself. Everybody were looking down at me. I just felt like I was a crook in another word . . . I felt nervous. Just a nervous wreck." We are of the opinion that a reading of plaintiff's declaration as a whole shows that he sued and was seeking damages for injury to himself as an individual and in his capacity as a businessman. There was no evidence that at the time of the publication of the articles in question he was doing business as a partnership or as a corporation which would prevent the recovery of this type of damages. *National Refining Co.* v. *Benzo Gas Motor Fuel Co.*, 20 F. 2d 763, 766 (8th Cir. 1927); 33 Am. Jur., Libel and Slander, *s.* 205, *p.* 195.

The pre-trial order with respect to plaintiff's claims read as follows: "In this action the plaintiff claims that the defendants in their newspapers published said defamatory statements about the plaintiff which injured him in his business and reputation." Assuming, without deciding, that this order excluded a claim by the plaintiff for injured feelings, mental anguish and personal or public humiliation, the Trial Court had discretionary authority to permit in the interest of justice modification of the order to conform to the evidence in the case. *Lynch* v. *Bissell*, 99 N. H. 473, 478; *Lamarche* v. *Granite State &c. Ins. Co.*, 101 N. H. 210, 213. This element of damages could properly be considered by the jury. Restatement, Torts, *s.* 623.

Defendant argues further that the "evidence as to alleged damages demonstrated no injury to business or reputation, and was so uncertain, speculative, conjectural, and vague as to be incapable of ascertainment or discernment." Plaintiff stated at the trial his position on the issue of damage to him in his capacity as a businessman as alleged in his pleadings to be as follows: "We are not claiming loss of profits as part of the damages here. We propose to show the extent to which gross business was driven away as a

result of the damage to the business reputation and the effect of that driving away of our business upon the plaintiff's overall business condition, the amount of money he could or couldn't earn and withdrawn from his business, and we rely upon it as some evidence of the extent to which this man was damaged in his capacity as a business man." In order to prove "the extent to which our gross business was driven away, the amount of gross business which we lost and the effect upon the operation itself," plaintiff proceeded as follows: he undertook to show "an established business, the amount of sales for a substantial period preceding the publication, the amount of sales subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication." *Erick Bowman Remedy Co.* v. *Jensen Salsbery Laboratories*, 17 F. 2d 255, 261 (8th Cir. 1926).

There was evidence that each edition of the Union-Leader in which the promotional notices were published was probably read by between 60,000 to 80,000 persons in the city of Manchester and the area around it. There was further evidence that each edition of the Sunday News in which these articles appeared were read by from 100,000 to 130,000 persons of which 25,000 to 30,000 were in the Manchester area. There was testimony that these articles were discussed "a lot." These discussions took place at the highway department, at city hall, along the street, in a club, in a lot of stores, in the smoking room of a factory, "practically anywhere I went in public or people I bumped into." "In great many circles where Roger was not known personally the reputation of his Garden Center was questioned after the articles." There was further testimony that since these articles plaintiff's business reputation as a supplier of nursery materials and as a man engaged in the landscape field is "he might be dishonest, and it would be better to maybe call someone else." This situation was in existence at the time of the trial.

There was also evidence that after these articles, new customers were not as numerous as they were the previous years. Also that before this difficulty the plaintiff supplied several building contractors with shrubs and trees and that except for two of them none has returned since then. A customer satisfied by plaintiff's previous work for her testified that she was dissuaded from doing business with plaintiff by a total stranger clerking in a paint store and by co-employees at the telephone office.

Figures were introduced in evidence showing that plaintiff's

gross sales which had risen from $37,338.21 in 1949 to $71,072.26 in 1953 were $42,645.14 in 1954, $34,660.23 in 1955, $46,082.65 in 1956 when plaintiff had to give up the Garden Center and nursery stock business. Plaintiff still has the landscaping service. The sales of the latter service which were $50,985.88 in 1953 dropped to $25,030.05 in 1954, $19,836.04 in 1955, $20,563.82 in 1956 and $14,974.10 in 1957. These gross sales which in 1953 had risen almost $12,000 over the previous year dropped below the figure for 1953 in amounts aggregating $123,000 for the years 1954 to 1957 inclusive.

There was testimony that plaintiff's business does not enjoy the bank credit or the general trade credit it enjoyed previous to these articles. There was evidence that at the beginning of 1954 plaintiff's equity in the business was $6,000 and that at the end of 1957 his equity position was a $10,000 deficit. It was testified that the reduction in gross sales with the resulting loss of equity in the business experienced since 1954 was "due to articles in the Union-Leader; bad publicity in regards to the Merrimack Common trees."

The fact that damages for loss of business are difficult of accurate determination does not prevent recovery for them. *Proto* v. *Bridgeport Herald Corporation,* 136 Conn. 557. Publication of these articles in a newspaper of large circulation in the area was evidence from which the jury could find that the defamatory statements had probably come to the attention of customers of the plaintiff. *Id.* Because the articles by their nature could be found to have a tendency to injure plaintiff's business, and from the testimony that they did, the jury could find that they were the cause of the loss of business incurred by plaintiff after their publication. *Id.*

We consider lastly defendant's argument that the amount of the verdict was excessive and was so exorbitant and grossly excessive as to demonstrate that it was awarded under the influence of passion, prejudice, partiality and mistake.

The law for the guidance of the Trial Judge in this matter has been stated as follows: "To justify the interference of the Court, the damages must be manifestly exorbitant; and so excessive as to warrant the belief that the jury must have been influenced by partiality or prejudice or have been misled by some mistaken view of the merits of the case." *Hanlon* v. *Pomeroy,* 102 N. H. 407, 409. The statements of the Trial Court in denying the defendant's motion to set the verdict aside indicate that he properly applied these

principles within the framework of the rules controlling the assessment of damages in the case before him.

The standard for the action of the appellate court in the circumstances has been thus set out: "The consideration of the defendant's motion involved questions of fact for the Judge and his decision should not be set aside unless no reasonable person would make it." *Id.; Roy* v. *Levy,* 97 N. H. 36, 40; *Wisutskie* v. *Malouin,* 88 N. H. 242, 246. "In most jurisdictions the view is taken that the trial judge, because of his more favorable position to determine the weight of the evidence and assess all the circumstances involved, may more freely interfere with the verdict than the appellate court and that his decision upon this question will be given great weight in passing upon the question on appeal." Annot. 35 A. L. R. 2d 218, 223.

The amount of the verdict in this case must be assayed in the framework of our rule that "when the element of malice enters into the wrong a more liberal rule of damages prevails, and the jury, taking into consideration all the circumstances of the wrong, ought to give as compensation what in their judgment it is reasonable that the plaintiff should receive and the defendant pay." *McBride* v. *Huckins,* 76 N. H. 206, 214.

Plaintiff's family "is one of the best . . . and extremely well thought of . . . he had a good reputation as a landscape gardener, a fine reputation." After having engaged in landscaping and nursery work since the age of 12 (he was 45 at the time of the trial), he started a business of his own a few years prior to 1950 operating from a greenhouse owned by his father. In September 1949 he bought land on Second Street in Manchester and with the help of a contractor he started to build his Garden Center in December and opened for business about May 10, 1950. Thereafter his sales increased from $37,338.21 in 1949 to $71,072.26 in 1953. In 1949 landscaping accounted for $37,338.21 of those sales and in 1953 the amount was $50,985.88.

On July 4, 1954, the Sunday News published on its front page the first of its articles in which it was charged that trees at Merrimack Common were below par; that trees of an inferior species failing to meet specifications under a contract given by the city to Chagnon Garden Center were being planted there. On the next four Sundays articles unfavorable to plaintiff appeared on the front page of that paper. Most of those articles were preceded on the previous Saturday by a promotional advertisement thereof on the front page of the Union-Leader.

These articles were understood by some of the potential 25,000 to 30,000 readers of the Sunday News in the Manchester area, the Union-Leader has 60,000 to 80,000 such readers, to have the following meanings: Chagnon "tried to cheat the city; tried to put something over." He "had taken advantage of his brother's position on the Highway Department and attempted to pass trees that might not meet specifications." He "was being dishonest." He "was a cheat, he was trying to cheat the city. . . . It looked like the city was being . . . taken." These articles were widely read and provoked discussion at city hall, a club, in stores, on the street.

Plaintiff's gross sales of $71,072.26 in 1953, before these articles were published, dropped to $42,645.14 in 1954, $34,660.23 in 1955 and $46,082.65 in 1956. New customers became less numerous than in previous years after the publication of the articles. All but two of the building contractors to whom plaintiff had been supplying shrubs and trees did not return. Chagnon had to give up the Garden Center and nursery stock business in 1956.

Sales of the landscaping business, which he retained, had been $50,985.88 the year before publication of those articles. In 1954 they dropped to $25,030.05. They were $19,836.04 in 1955, $20,-563.82 in 1956 and $14,974.10 in 1957. From a steady increase in the three previous years those sales dropped over $123,000 from 1954 to 1957. His bank and general trade credit were adversely affected.

The jury could find the defendant activated by malice, caused widespread publication over an extended period of time of articles seriously defamatory of plaintiff. They could find further that these libels caused serious injury to plaintiff's business reputation and caused him to suffer a substantial loss of business and credit which would probably continue in the future. *Dun & Bradstreet v. Robinson*, 345 S. W. 2d 34, *supra.* They could find that in addition to having sustained financial loss including the outright loss of his newly established retail business, the plaintiff was effectively deprived of an opportunity to improve the circumstances of his entire operation, and that he suffered as well a grave and lasting injury to his personal reputation and credit, with the mental distress which followed unwarranted exposure of himself and his family to the disgrace and obloquy of unjustified charges. In the circumstances we cannot say that the verdict was the result of passion, prejudice, partiality and mistake by the jury rather than an award of the compensation which "in their judgment it is

reasonable that the plaintiff should receive and the defendant pay." *McBride* v. *Huckins, supra.* Nor can we say that the Trial Court acted as no reasonable person would in refusing to set aside the verdict. *Wisutskie* v. *Malouin,* 88 N. H. 242, 246; *Proto* v. *Bridgeport Herald Corporation,* 136 Conn. 557.

*Judgment on the verdict.*

All concurred.