Aaron HARKAWAY, Plaintiff, Appellee,

v.

BOSTON HERALD TRAVELER CORPO-
RATION, Defendant, Appellant.

No. 7345.

United States Court of Appeals
First Circuit.

Nov. 5, 1969.

Walter J. Hurley, Boston, Mass., for appellant.

James D. St. Clair, Wellesley Hills, Mass., with whom Hale & Dorr, Boston, Mass., was on brief, for appellee.

Before ALDRICH, Chief Judge, WOODBURY,* Senior Circuit Judge, and COFFIN, Circuit Judge.

WOODBURY, Senior Circuit Judge.

This is an appeal from a judgment entered on a verdict for the plaintiff in an action for libel.

* By Special Designation.

The plaintiff is a member of the New Hampshire Bar residing and practicing in Nashua, New Hampshire. The defendant is a Massachusetts corporation which publishes a daily and a Sunday newspaper. Both papers circulate generally in Massachusetts and New Hampshire, particularly in the southern part of that state in the Nashua area. Over $10,000 exclusive of interest and costs is clearly involved in this litigation.

The material of which the plaintiff complains was first published on the front page of the defendant's newspaper on Sunday, March 24, 1968, under the title "The Two Worlds of George Kattar" with the subtitle "How a man with friends in the Cosa Nostra became a big business tycoon and a pal of N. H. officials," and later in several shorter so-called "reaction" or "follow up" articles on subsequent days in the defendant's daily newspaper.

The original Sunday article describes Kattar's meteoric rise in the business world, his extensive interests in various enterprises including loan companies, restaurants, night clubs and a fashionable home and resort property on Lake Winnepesaukee where he played host to New Hampshire law enforcement officials. It mentions fires of suspicious origin in properties in which Kattar held an interest and it mentions his former fondness for the company of "underworld figures" with hints that his association with such persons had continued and was something more than social. Specifically the article reports that an FBI report on file in the court in Providence, Rhode Island (what court was not specified), linked Kattar with one Raymond Patriarca, said by an informer to be the head of Cosa Nostra in New England, who with others had been convicted in Boston for conspiracy to murder. It names a number of persons said to have been engaged with Kattar in various business enterprises and transactions, some questionable, and, with a picture, refers to George Pappagianis, who had been a practicing member of the bar in

Nashua and was later appointed Attorney General of New Hampshire, as the treasurer of D and D Holding, Inc., a New Hampshire corporation formed by Dowd and Douglas in which Kattar was said to have a substantial interest. In short, the article depicts Kattar as a definitely unsavory character with ties to the underworld of organized crime who associated with high New Hampshire officials charged with enforcing the law.

The plaintiff is mentioned in two connections in this article. It reports the plaintiff as clerk of D and D Holding, Inc., who told defendant's reporter over the telephone that Pappagianis' connection with the corporation was a "mere formality" that he "really didn't know anything about the corporation," and that he (Harkaway) could not say at the time he became clerk whether or not he knew that Kattar had any financial interest in the company, and then he terminated the connection with the remark "I've got to run now." It also reports that the plaintiff represented Douglas in a suit brought against him by one of Kattar's corporations and lost the case involving $88,851.

The plaintiff complains primarily of a "follow up" article published in the defendant's newspaper on Tuesday, March 26, 1968. This article referring to the article of the previous Sunday contains the following:

"The Herald Traveler story said also that Pappagianis, before his appointment as attorney general, had been treasurer of a firm controlled by Kattar.

"Yesterday, Kattar told reporters the firm 'was not my client * * * I took part in nothing.'

"He said his law partner Aaron Harkaway of Nashua, who was clerk of the firm, * * *"

The defendant concedes that the foregoing implies that the plaintiff and Kattar were partners in the practice of law and it admits that this is erroneous. It says that Kattar's name was inadvertent-

ly substituted for that of Pappagianis.* Nevertheless the fact remains that the general public would infer from the article that the plaintiff had been closely and intimately associated in the practice of law with a man depicted as an underworld character, although members of the local bar would know that no such association could have existed because Kattar was not a member of the bar.

The defendant contends that the implication of the plaintiff's association with Kattar is not defamatory, first because it was not believable on its face for the reason that Kattar was described in the Sunday article not as a lawyer but as a "wealthy, influential developer of New England resort properties" and second because if the statement were taken on its face the only plausible innuendo is that the plaintiff was one of the persons associated with Kattar in his legitimate rather than in his illegitimate activities.

█ To consider these contentions we turn to the applicable law which counsel agree, and the court below quite correctly ruled, is that of New Hampshire.

█ It has long been settled in New Hampshire that the publisher of a newspaper enjoys "no peculiar rights or special privileges or claims to indulgence. He may publish the truth, but has no right to publish falsehood to the injury of others." Smart v. Blanchard, 42 N.H. 137, 151 (1860). Newspaper publishers, like everyone else, are liable in damages for defamatory statements, that is, false statements that hold a person up to hatred, ridicule or contempt or that injure him in his trade, business or profession. Chagnon v. Union Leader Corp., 103 N.H. 426, 434, 174 A.2d 825 (1961), cert. denied 369 U.S. 830, 82 S.Ct. 846, 7 L.Ed.2d 795. And: "It is immaterial whether the words spoken impute an offense to the plaintiff in a direct manner, or indirectly, by such hints or modes of expression as are likely to convey the intended meaning to the persons to whom

the words were addressed. Taking the words in the sense in which the rest of mankind would ordinarily understand them, it is for the jury to say whether in their minds they convey the idea imputed." Sturtevant v. Root, 27 N.H. 69, 72 (1853), see also Gendron v. St. Pierre, 73 N.H. 419, 423, 62 A. 966 (1905). When words are capable of more than one meaning it is a question of law whether they could be understood as defamatory; whether words capable of a defamatory meaning were so understood is a question of fact properly submitted, as in this case, to the jury. Richardson v. Thorpe, 73 N.H. 532, 534, 63 A. 580 (1906); Blanchard v. Claremont Eagle, 95 N.H. 375, 378, 63 A.2d 791 (1949).

In all probability members of the local bar would know that Kattar was not a lawyer and hence would realize that the implication that he and the plaintiff were partners in the practice was erroneous. But we cannot assume that the general public would be as well informed. Nor can we assume that the casual newspaper reader would read all the articles or read them critically or analytically enough to realize that an obvious mistake must have been made in identifying Kattar instead of Pappagianis as the plaintiff's law partner.

█ The defendant's articles clearly and unmistakenly link Kattar with the criminal underworld and certainly it could be found that they link the plaintiff with Kattar. This connection of a practicing member of the bar with organized crime could well be found to be defamatory and hence actionable.

The question remains whether the articles were privileged.

A so-called conditional privilege to publish false defamatory matter has long been recognized in New Hampshire. State v. Burnham, 9 N.H. 34, 41, 42 (1837). The existence of the doctrine has been repeatedly affirmed in succeeding years. See Palmer v. Concord, 48

* The defendant's reporter believed that the plaintiff and Pappagianis had been law partners but actually they had not, although they had practiced together in the same suite of offices in Nashua.

N.H. 211, 216, 217 (1868); Carpenter v. Bailey, 53 N.H. 590, 594 (1873), and Lafferty v. Houlihan, 81 N.H. 67, 72, 73, 121 A. 92 (1923). This privilege was succinctly defined in Chagnon v. Union Leader Corp., 103 N.H. 426, 438, 174 A. 2d 825, 833 (1961), cert. denied 369 U.S. 830, 82 S.Ct. 846, 7 L.Ed.2d 795, as follows:

> "Even though a defendant cannot justify the publication because it can be found to be untrue he may excuse it by showing it was privileged. A conditional privilege, which is what is claimed here, is established if the facts, although untrue, were published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds of its truth."

We may concede the defendant's good faith and lack of malice and that there was lawful occasion and a justifiable purpose in calling public attention to the infiltration of lawful business in New Hampshire by organized crime. But while it may have had reasonable grounds for believing that Pappagianis was the plaintiff's law partner it does not profess to have thought, much less to have reasonable grounds to believe, that Kattar was in partnership with the plaintiff. It says that Kattar's name was used in the article by inadvertence, by what it calls a typographical error, in a context where the name of Pappagianis should have appeared. This provides no basis for invoking the conditional privilege. Inadvertently naming A for B is no defense to an action by A grounded on a defamatory utterance. Whitcomb v. Hearst Corp., 329 Mass. 193, 107 N.E.2d 295 (1952).

Although a member of the bar in private practice is an "officer of the court" he is not a public official. He remains a private citizen. Therefore the rule of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), as elaborated in Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), does not apply.

Affirmed.