NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-southern judicial district
No. 2015-0573

THOMAS M. BENOIT & a.

v.

JOSEPH A. CERASARO, TRUSTEE OF THE JOSEPH A. CERASARO
REVOCABLE TRUST & a.

Argued: March 8, 2016
Opinion Issued: April 19, 2016

Tarbell & Brodich, P.A., of Concord (David E. LeFevre on the brief and orally), for the plaintiffs.

Primmer Piper Eggleston & Cramer PC, of Manchester (Matthew J. Delude on the brief and orally), for defendants Ronald N. and Rita A. Delude.

DALIANIS, C.J. The plaintiffs, Thomas M. Benoit and Kathleen A. Nawn-Benoit, appeal from an order of the Superior Court (Colburn, J.) granting the summary judgment motion filed by defendants Ronald N. and Rita A. Delude, and denying the plaintiffs' cross-motion for summary judgment. We affirm.

I. Facts

The summary judgment record reflects the following pertinent facts. In 1974, a developer created plans for the Profile Estates Subdivision

(subdivision), a development in Merrimack.  The plans, recorded in the Hillsborough County registry of deeds, created 70 lots and a seven-acre parcel of "Common Land for Profile Estates, Phases I and II" (Common Land) (capitalization omitted).  The developer also recorded a "Declaration of Covenants" for the subdivision (Declaration).  According to the Declaration, the developer desired to "create . . . a residential community with permanent open spaces and other common facilities for the benefit of [that] community."  With the exception of five lots, all of the lots, including the Common Land, are subject to the Declaration.  The developer included reference to the Declaration in each deed conveyed to the original purchaser of a lot in the subdivision.

The Declaration provides that all of the lots subject to it "shall be held, transferred, sold, conveyed and occupied subject to the covenants, restrictions, easements, charges and assessments" set forth therein.  The Declaration requires each record owner of the lots subject to it to join the "PROFILE ESTATES HOMEOWNERS ASSOCIATION" (Association).  The Association "is to be formed by the Owners for the purpose of maintaining and administering the Common [Land] and facilities thereon, administering and enforcing the restrictions, and collecting and disbursing the assessments and charges."  The developer "may retain the legal title" to the Common Land until the developer is of the opinion that the Association "is able to maintain the same," but "must convey legal title to the Association when fifty-one percent (51%) of the Lots have been sold."  The cost of maintaining the Common Land "shall be borne by the [d]eveloper or its successors in title until the transfer of said Common [Land] to the Association and thereafter the cost of maintenance shall be borne by said Association."

Each record owner of the properties subject to the Declaration is given "a right and easement of enjoyment in and to" the Common Land, "and such easement shall be appurtenant to and shall pass with the title to every lot."  The Common Land is "restricted to recreational, conservation and park uses for all of the Owners" and no structures shall be erected on the Common Land "except as incident to said uses."

The Declaration provides that the restrictions contained in it

> shall run with, and bind the land, and shall inure to the benefit of and be enforceable by the Association, or the Owner of any land subject to this Declaration, their respective legal representatives, heirs, successors, and assigns, for a term of ten (10) years from the date this Declaration is recorded, after which time said restrictions shall be extended for successive periods of ten (10) years unless an instrument signed by the then Owners of two-thirds (2/3) of the Lots has been recorded, agreeing to change said restrictions in whole or in part.

The Declaration further provides that the failure of the Association or any owner "to enforce any covenant or restriction" contained therein "shall in no event be deemed a waiver of the right to do so thereafter."

All of the lots in the subdivision were subsequently sold, but the Association was never formed, and the developer retained title to the Common Land. The developer, however, failed to pay the property taxes and the Common Land was sold at a tax sale in August 1979 to R. Robert Gaumont, Jr., who owned and lived in Lot 51 in the subdivision, adjacent to the Common Land. Gaumont recorded the tax sale deed in September 1981.

In August 2001, Gaumont sold Lot 51 to the plaintiffs by warranty deed. The deed to Lot 51 stated that the conveyance was "[s]ubject to and with the benefit of" the Declaration. On the same date, Gaumont sold the Common Land to the plaintiffs for less than $100 by quitclaim deed. Since buying the Common Land, the plaintiffs have paid approximately $40,000 in taxes on it.

In July 2014, over the objections of several lot owners in the subdivision, the plaintiffs obtained a variance to build a single-family residence on the Common Land. In January 2015, the plaintiffs brought a petition against the residents of the subdivision seeking: (1) a declaratory judgment that the Declaration is unenforceable; (2) an order that they have acquired title to the Common Land "free and clear of the Declaration through adverse possession"; and (3) to the extent that the Declaration is deemed enforceable, an order requiring the defendants to form the Association, purchase the Common Land from the plaintiffs "at its fair market value," and reimburse them for their "out-of-pocket expenses . . . , including real estate taxes."

Two residents, the defendants before us, moved for summary judgment "on behalf of all" of the defendants on the plaintiffs' claims, and the plaintiffs cross-moved for summary judgment on their request for a declaratory judgment. The trial court granted the defendants' motion for summary judgment and denied the plaintiffs' cross-motion, and concluded that "[b]ecause the undisputed material facts and the applicable law apply equally to the [plaintiffs'] claims asserted against all of the other [defendant]-lot owners, they are likewise entitled to summary judgment." The court subsequently denied the plaintiffs' motion for reconsideration, and this appeal followed.

II. Standard of Review

"In reviewing the trial court's rulings on cross-motions for summary judgment, we consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law." Bovaird v. N.H. Dep't of Admin. Servs., 166 N.H. 755, 758

3

(2014) (quotation omitted). "If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment." Id. (quotation omitted). "We review the trial court's application of the law to the facts de novo." Id. (quotation omitted).

III. Enforceability of the Declaration

The plaintiffs argue that the trial court erred in ruling that the Declaration is enforceable. They assert that the tax sale extinguished the Declaration: (1) under the "tax assessment theory"; (2) because the Association was never formed and rights under the Declaration never vested; and (3) upon default of redemption by the Association. The trial court considered, and rejected, each of these arguments, as do we.

"Ordinarily, a tax sale does not divest easements charged on the property sold." Gowen v. Swain, 90 N.H. 383, 387 (1939) (quotation omitted); see Marshall v. Burke, 162 N.H. 560, 564 (2011) (holding that a tax sale does not extinguish prescriptive easements that have ripened into vested property rights prior to recording of the tax deed); see also Buchholz v. Waterville Estates Assoc., 156 N.H. 172, 175 (2007) (concluding that condominium covenants that run with the land survive a tax sale); cf. Burke v. Pierro, 159 N.H. 504, 514-15 (2009) (when 20-year prescriptive period had not run before town acquired title to the lot, the tax sale created a new title).

The plaintiffs acknowledge this case law. Nonetheless, relying upon cases from other jurisdictions, they first argue that, in this case, we should apply the "tax assessment theory" and conclude that the tax sale extinguished the easements because "the value of the easements and restrictions has never been assessed against the dominant estates," and the Common Land "has always been assessed at fair market value as a buildable lot."

We agree with the trial court that the tax sale did not extinguish the Declaration as a matter of law. We also agree with the court's conclusion that, pursuant to Gowen and Marshall, "[w]hether or not the assessors accurately assessed the dominant and servient estate[s'] value is immaterial, because it is presumed that assessors take into account the effect restrictions have on the valuation of property." We recognized in Gowen that "[p]resumably assessors take into account this effect of easements on value in making their appraisals." Gowen, 90 N.H. at 387. "[I]f, acting in ignorance of the existence of an easement, they overvalue the servient estate, the mistake is correctible by abatement proceedings unless circumstances exist which render abatement inequitable." Id. (citation omitted). Thus, "while assessors are presumed to take account of the impact of easements on the value of properties, the practical reality is that the actual burden of insuring that this occurs is placed

4

on the property owner through the tax abatement process." Marshall, 162 N.H. at 566.

Second, the plaintiffs argue that the tax sale extinguished the Declaration because the Association was never formed and rights under the Declaration never vested. They assert that under the language of the Declaration, the Declaration was "subject to" the express condition precedent that title to the property was supposed to be owned by the Association, but because the owners never elected to form an Association, "[the defendants'] right to enforce the easements and restrictions had never vested, and the tax sale extinguished the Declaration." (Quotation omitted.) The defendants counter that considering the language of the Declaration as a whole, it "makes clear that its easements and restrictions vested upon recordation and therefore survived the tax sale."

Under its plain language, the Declaration vested upon being recorded in the registry of deeds in 1974. The Declaration states that the Common Land "is and shall be held . . . subject to the covenants, restrictions, easements, charges and assessments" as set forth therein. Those restrictions "shall run with, and bind the land, and shall inure to the benefit of and be enforceable by the Association, or the Owner of any land subject to this Declaration . . . for a term of ten (10) years from the date this Declaration is recorded, after which time said restrictions shall be extended for successive periods of ten (10) years." (Emphases added.)

In addition, rejecting the plaintiffs' argument that the Declaration creates a condition precedent — the creation of the Association and transfer of legal title to it — the trial court reasoned that "reading the document as a whole, it is apparent that the Declaration contemplated the creation of the Association, and transfer of legal title to it, as events that would occur, if at all, after the Declaration was recorded." As the trial court correctly noted, "[i]ndeed the Declaration anticipates the possibility that less than 51% of the Lots would be sold, in which case the Developer is not required to transfer legal title to the Association but would be, however, responsible for" the cost of maintenance of the Common Land. Moreover, the trial court reasoned, "in the absence of an Association, lot owners are permitted to enforce the Declaration."

We conclude that, read in their entirety, the easements and restrictions set forth in the Declaration vested upon being recorded in the registry of deeds and, therefore, the Declaration was not extinguished by the tax sale that took place five years later.

Third, the plaintiffs argue that the tax sale extinguished the Declaration because the defendants, having received actual and constructive notice of the tax sale, failed to exercise their right of redemption pursuant to RSA 80:32 (2012). However, because as a matter of law the tax sale did not extinguish the

Declaration, there were no interests for the defendants to redeem and, thus, redemption is not applicable. The plaintiffs argue that because the defendants' rights in the Common Land "are derivative of their ownership of the entire fee interest in the Property, as opposed to, a mere easement," "[u]pon default of redemption, the tax sale extinguished [the defendants'] ownership rights in the Property, and their corresponding rights under the Declaration were equally extinguished." These arguments, however, were not raised in the trial court. Accordingly, we decline to address them on appeal. See Dukette v. Brazas, 166 N.H. 252, 255 (2014) (explaining that parties generally may not have judicial review of matters not raised before the trial court).

IV. Laches

The plaintiffs argue that the Declaration is unenforceable under the doctrine of laches. They assert that "the facts of this case overwhelming[ly] support a finding that the [defendants] sat on their rights for more than 35 years" in that they "never sought to use the Property as common land, never sought to form the Association, and never sought to enforce the Declaration."

"Laches is an equitable doctrine that bars litigation when a potential plaintiff has slept on his rights." Appeal of Prof'l Fire Fighters of Hudson, 167 N.H. 46, 57 (2014) (quotation omitted). "Laches, unlike limitation, is not a mere matter of time, but is principally a question of the inequity of permitting the claim to be enforced — an inequity founded on some change in the conditions or relations of the parties involved." Id. (quotation and ellipsis omitted). "Because it is an equitable doctrine, laches will constitute a bar to suit only if the delay was unreasonable and prejudicial." Id. (quotation omitted). "The trial court has broad discretion in deciding whether the circumstances justify the application of laches; we will not overturn its decision unless it is unsupported by the evidence or erroneous as a matter of law." Village Green Condo. Ass'n v. Hodges, 167 N.H. 497, 505 (2015).

Based upon the evidence presented, the trial court found that

at no time before July of 2014, when the [plaintiffs] received a variance for the Common Land, did the [defendants] become aware of any misconduct by the [plaintiffs] that would require them to exercise and enforce their rights under the Declaration. The misconduct necessary to place the [defendants] on notice would unavoidably involve activity that was contrary to the restrictions and rights set forth in the Declaration. Despite their differences, the [plaintiffs'] and [defendants'] affidavits make clear that nothing was ever built or developed on the Common Land in violation of the Declaration. The evidence shows that the Common Land has remained unchanged since the [plaintiffs] purchased it. Although the [plaintiffs] alleged that [the Common Land] has never been

6

used as common land and that only one individual ever received permission to use the Common Land to cut firewood, they do not affirmatively state that they prohibited other lot owners from entering upon and using the Common Land for recreational purposes. The closest the [plaintiffs] come to alleging that they prohibited others from using [the Common Land] comes in the form of a single instance when they called the police after hearing what they believed to be people trespassing on the Common Land.

(Citations omitted.) Accordingly, the trial court concluded that the plaintiffs "have not met their burden of showing that the [defendants] became aware of the misconduct and then slept on their rights; rather, the undisputed facts show that the delay was merely a result of the [defendants'] lack of awareness."

Based upon our review of the record, we conclude that the trial court's findings are supported by the evidence and are not erroneous as a matter of law. Furthermore, the Declaration itself provides that the failure of the Association or any owner "to enforce any covenant or restriction" contained therein "shall in no event be deemed a waiver of the right to do so thereafter."

The plaintiffs also argue that the trial court failed to take all reasonable inferences of fact in their favor, specifically as to Gaumont's statement in his affidavit that he bought the Common Land "to ensure it remained undeveloped common land for the enjoyment of . . . the other residents." The plaintiffs assert that the only reasonable inferences that can be drawn from this statement are that Gaumont "believed the tax sale extinguished the Declaration," and that Gaumont "believed the other [r]esidents had no right to use the [Common Land] after the tax sale." However, the trial court specifically addressed this argument when it denied the plaintiffs' motion for reconsideration. The trial court correctly stated that the plaintiffs' argument is "directly contradicted by . . . Gaumont's affidavit. Assuming . . . Gaumont's subjective beliefs are relevant, he stated in his affidavit that he purchased the [Common Land] subject to all easements and covenants. Moreover, a reasonable inference may be drawn from . . . Gaumont's affidavit that his purchase was to further ensure the [subdivision] residents' ability to use the [Common Land]."

V. Conveyance to the Association

The plaintiffs argue that the trial court erred when it ordered the defendants to form the Association and the plaintiffs to convey the property to the Association for no consideration. They assert that "New Hampshire law is clear that the nature of the title conveyed through a tax sale is that of fee simple," but that "[t]he question of whether or not an easement survives a tax sale is a wholly different issue than whether or not the title that was conveyed by the tax sale was in fee simple or that of a defeasible fee by virtue of a

7

covenant to convey." Thus, according to the plaintiffs, "the affirmative covenants contained within the Declaration which impose obligations upon them to maintain and convey the [Common Land], without some corresponding reciprocal benefit, must have been extinguished by the tax sale." The trial court rejected this argument. Taking the plaintiffs' argument as asserting that the court "implicitly determined their title to the [Common Land] was a defeasible fee and not held in fee simple," the trial court stated that it "made no such determination." Rather, it "ordered the [plaintiffs] to transfer the [Common Land] based on the Declaration's requirement to convey it after more than 51% of the [subdivision] properties were sold. Therefore, [the plaintiffs'] title status was not relevant."

In addition, the plaintiffs argue that the trial court's order constitutes "an unconstitutional taking without just compensation in violation of Part 1, Article 12 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the Constitution of the United States." The trial court rejected this argument, noting that the plaintiffs "did not develop [it] beyond a conclusory statement and failed to cite any authority for their position." On appeal, the plaintiffs have likewise failed to develop this argument sufficiently for our review and, accordingly, we decline to address it. See Lennartz v. Oak Point Assocs., 167 N.H. 459, 464 (2015).

VI. Equitable Relief

The plaintiffs argue that the trial court erred in the exercise of its equitable powers in failing to craft an equitable remedy. They assert that "[u]nder the unique circumstances of this case," fairness requires that, in addition to ordering that the Association be formed and hold title to the Common Land, the Common Land should be purchased from them by the residents of the subdivision at its fair market value and the plaintiffs reimbursed for all of their out-of-pocket expenses relative to the Common Land, including real estate taxes.

We review the trial court's decision whether to grant equitable relief for an unsustainable exercise of discretion. Conant v. O'Meara, 167 N.H. 644, 649 (2015). In doing so, we determine "whether the record establishes an objective basis sufficient to sustain the discretionary judgment made." State v. Lambert, 147 N.H. 295, 296 (2001). "The court has broad and flexible equitable powers which allow it to shape and adjust the precise relief to the requirements of the particular situation." Chase v. Ameriquest Mortgage Co., 155 N.H. 19, 24 (2007) (quotation omitted). "A court of equity will order to be done that which in fairness and good conscience ought to be or should have been done. It is the practice of courts of equity . . . to administer all relief which the nature of the case and facts demand." Id. (quotation omitted). The party asserting that a trial court order is unsustainable "must demonstrate that the ruling was

unreasonable or untenable to the prejudice of his case." Foley v. Wheelock, 157 N.H. 329, 332 (2008).

The trial court determined that the plaintiffs "are not entitled to the equitable relief they seek because the Declaration prohibits it." The Declaration provides that the cost of maintenance of the Common Land "shall be borne by the [d]eveloper or its successors in title until the transfer of said Common [Land] to the Association and thereafter the cost of maintenance shall be borne by said Association." As the trial court explained:

> [i]t is undisputed that the [plaintiffs] are the Developer's successors in title and that the Association was never formed. It follows that the [plaintiffs] have been, and remain responsible for, the "cost of maintenance" of the Common Land until such time as the Association is formed. Also, under the terms of the Declaration, the [defendants] are not required to purchase the Common Land deed from the [plaintiffs]; rather, the [plaintiffs] must "convey legal title" to the Association.

Furthermore, the trial court reasoned that the plaintiffs' "own conduct cuts against the equitable relief they seek." "When equitable as distinguished from legal relief is sought, equitable as distinguished from legal defenses have to be considered." Nashua Hospital v. Gage, 85 N.H. 335, 343 (1932) (quotation omitted). "The conduct of the plaintiff may disentitle him to relief; his acquiescence in what he complains of or his delay in seeking relief may of itself be sufficient to preclude him from obtaining it." Id. (quotation omitted).

The undisputed evidence supports that the Declaration was recorded in the registry of deeds when the plaintiffs purchased both Gaumont's property and the Common Land. Therefore, the plaintiffs purchased the Common Land with constructive notice of the easements and restrictions encumbering it. See C F Invs. v. Option One Mortgage Corp., 163 N.H. 313, 316 (2012) (explaining that "properly recorded instruments are deemed to give notice to prospective purchasers of any outstanding claims against property"). In addition, the trial court reasoned that

> [m]ore significantly, not only does the [plaintiffs'] deed for . . . Gaumont's property . . . specifically reference the Declaration, the [plaintiffs] also purchased the seven-acre Common Land by way of quitclaim deed for less than $100. Such a small cost for such a large piece of real estate should have alerted the [plaintiffs] to the restrictions and easements placed on the Common Land. Despite knowledge of the Declaration, the plaintiffs paid taxes on the Common Land for thirteen years without complaint. Only after seeking a variance to build on the property, to which several lot

9

owners protested, did they seek to quiet title to the Common Land or equitable relief in the form of compensation.

"[O]ur task is not to determine whether we would have found differently . . . ." In re Adam M., 148 N.H. 83, 84 (2002). Our only function on review is to determine whether a reasonable person could have reached the same decision as the trial court on the basis of the evidence before it. See id. We conclude that the record establishes an objective basis sufficient to sustain the discretionary judgment made. See Lambert, 147 N.H. at 296. Accordingly, the plaintiffs have failed to establish that the court's order constitutes an unsustainable exercise of discretion.

VII. Tax Abatement

The plaintiffs argue that the trial court erred when it concluded that they should have obtained a tax abatement when "there was a complete absence of evidence or argument submitted to the trial court that the [plaintiffs] would, in fact, have been entitled to a tax abatement." We disagree with the plaintiffs' characterization of the trial court's order. The trial court did not conclude that the plaintiffs should have obtained a tax abatement. The plaintiffs argued that the tax sale extinguished the Declaration because the value of the easements and covenants were neither subtracted from the Common Land nor assessed as part of the dominant estates of the residents of the subdivision. In addressing this argument, the trial court simply noted that New Hampshire law is that any mistake on the part of the assessors in overvaluing the servient estate is correctable by abatement proceedings, "unless circumstances exist which render abatement proceedings inequitable." (Quotation omitted.) Assuming without deciding that the Common Land was overvalued and the assessors failed to take into account restrictions encumbering it, the trial court found that the plaintiffs knew of the easements and covenants because they were recorded and cited in the plaintiffs' deed to lot 51. The court also found that the plaintiffs knew or should have known that the Common Land was subject to the easements and covenants because they purchased it for less than $100 by a quitclaim deed. Therefore, the trial court concluded that "it is beyond dispute that these circumstances are not such that would render abatement proceedings . . . inequitable." Indeed, the trial court underscored in its order denying the plaintiffs' motion for reconsideration that their "actual success in abatement proceedings is irrelevant to the Court's decision. After concluding that the Declaration was not extinguished by the tax sale, the Court merely noted that the proper avenue to address an overvaluation of property burdened by covenants is a tax abatement."

Affirmed.

HICKS, CONBOY, LYNN, and BASSETT, JJ., concurred.

10