NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Cheshire
No. 2017-0682


LORRAINE MACDONALD & a.

v.

LISA JACOBS

Argued: October 11, 2018
Opinion Issued: January 15, 2019


Law Offices of Joseph S. Hoppock, P.L.L.C., of Keene (Joseph S. Hoppock on the brief and orally), for the plaintiffs.


Law Offices of Kelly E. Dowd, PLLC, of Keene (Kelly E. Dowd on the brief and orally), for the defendant.


BASSETT, J. The defendant, Lisa Jacobs, appeals both a jury verdict in the Superior Court (Ruoff, J.) for the plaintiffs, Lorraine and Peter MacDonald, on their defamation claim, and a permanent injunction issued by the trial court. We affirm.

The record supports the following facts. The defendant seasonally resides in Fitzwilliam. According to the plaintiffs, in 2012 they purchased a vacation home that abuts or is near the defendant's family's property. Thereafter, the defendant began letter-writing campaigns in which she falsely

accused the plaintiffs of, among other things, a variety of illegal activities. In 2016, the plaintiffs sued the defendant for defamation. Following a trial, the jury found that the defendant's statements were defamatory and that they were made with malice, thereby warranting the award of special damages. In addition, the trial court, finding the defendant's statements "vast and disturbing," issued a permanent injunction prohibiting the defendant from, inter alia, going within a five-mile radius of the plaintiffs' home in Fitzwilliam and from entering the plaintiffs' hometown in Sterling, Massachusetts.

On appeal, the defendant contends that the trial court erred by (1) denying a mistrial when the plaintiffs' counsel made a "golden rule" argument to the jury, (2) denying her motion for summary judgment because New Hampshire requires proof of "actual damages" for defamation, (3) applying an incorrect standard to the plaintiffs' claim for enhanced compensatory damages, (4) determining that the defendant's speech was not of "public concern," (5) admitting prejudicial other bad act evidence, and (6) "ordering [her] physical removal . . . from her family's vacation property" in Fitzwilliam and "banishing" her from Sterling. We address these issues in turn.

I. Golden Rule Argument

The defendant first argues that the trial court erred in denying her motion for a mistrial when the plaintiffs' counsel made a "golden rule" argument to the jury. During closing argument the plaintiffs' counsel stated:

> You heard about their anxiety, that when a car comes down the road. Can you imagine that? You know, you're sitting in this rural area on a lake. It's idyllic. It's, you know, your perfect summer home. And you're on vacation. You want to relax. You don't need that kind of nonsense.

The defendant objected, and the trial court overruled her objection. The plaintiffs' counsel then continued, "You're in this environment where you want to get away from it all. And you have . . . the neighbor from hell who wants to drive you away. What is that worth? What -- how do you value what she has done to these people?"

On appeal, the defendant argues that this was a "text-book golden rule argument." Although the defendant concedes that "New Hampshire has never ruled that an impermissible closing argument . . . warrants automatic mistrial," she asserts that given the lack of a curative instruction following counsel's objection, "the only possible legal result can be a declaration of a mistrial." (Quotation omitted.) Absent an unsustainable exercise of discretion, we will affirm a trial court's decision on whether a mistrial or other remedial action was necessary. State v. Kuchman, 168 N.H. 779, 787 (2016); see State

v. Lambert, 147 N.H. 295, 296 (2001) (explaining that to show that the trial court's decision is not sustainable, "the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case" (quotation omitted)).

"A 'golden rule' argument is made when counsel urges jurors to put themselves in a particular party's place, or into a particular party's shoes." Walton v. City of Manchester, 140 N.H. 403, 406 (1995) (citation omitted); see Caudle v. District of Columbia, 707 F.3d 354, 359 (D.C. Cir. 2013) (noting that it is impermissible, for example, "to ask jurors how much the loss of the use of their legs would mean to them," to tell jurors "do unto others as you would have them do unto you," or to tell jurors, "in a reverse golden rule argument, 'I don't want to ask you to place yourself in the plaintiff's position'" (citations and brackets omitted)). "Courts generally condemn these arguments because they encourage the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." Walton, 140 N.H. at 406 (quotation omitted).

However, we need not address the propriety of "golden rule" arguments because we disagree with the defendant's contention that the plaintiffs' counsel asked the jurors to put themselves in the shoes of the plaintiffs or to base their verdict on something other than the evidence at trial. Id. Rather, the plaintiffs' counsel asked the jurors to consider, based on the trial testimony, the effect that the defendant's actions had on the plaintiffs, and to take that into account when considering damages. Lorraine testified that she fears for her life and for the safety of her family, that she has "become anxious about even being in [her] yard," that she "physically gets knots in [her] stomach and [her] heart races" when she goes home "wondering who is going to be waiting in [her] driveway," and that she is "not comfortable anymore being alone at [her] house in Fitzwilliam." In addition, she testified that she is worried "about where [the defendant is] taking these letter campaigns next and how they're going to impact [her] life." Peter testified that the defamatory remarks made by the defendant have resulted in him having "an I'm-always-looking-over-my-shoulder feeling," and a feeling of "what's-going-to-happen-next." In addition, he testified that he "always [has] a knot in [his] stomach," that he does not sleep well at night, and that when he "hear[s] a car coming down the road in Fitzwilliam, we jump out of our chairs."

We agree with the plaintiffs that the contested argument was not an "appeal to passion, prejudice or sympathies," but was, rather, a "fair comment on the evidence." (Quotation omitted.) Notably, the trial court correctly instructed the jury prior to its deliberations that, "[i]n determining the amount of damages to allow the Plaintiffs, you may draw such inferences as are justified by your common experiences and observations of human events, from the evidence of the nature of the injuries and the results thereof." Because the

closing remarks made by the plaintiffs' counsel were not "calculated . . . to encourage the jury to make a decision based on personal interest and bias rather than reason and the presented evidence," Walton, 140 N.H. at 408, we conclude that the trial court's denial of the defendant's motion for a mistrial was not an unsustainable exercise of discretion.

## II. Defamation

Next, we turn to the defendant's contention that the trial court erred in several respects with regard to the plaintiffs' defamation claim. The defendant challenges the trial court's determinations that: (1) a claim of defamation per se does not require proof of "actual damages"; (2) enhanced damages in connection with an action for defamation per se does not require proof of "actual malice"; and (3) her speech did not constitute matters of "public concern."

### A. Actual Damages

Prior to trial, the defendant moved for summary judgment, arguing that the plaintiffs could not "establish damages, either general or specific," and that the defamation claim should be dismissed "due to lack of evidence of proof of actual harm to reputation as a result of [her] communications." She acknowledged that "[b]ecause in an action for per se defamation, a plaintiff may recover for both general damages and special damages relating to the tort, the plaintiff is not required to plead damages." Nonetheless, the defendant contended that the plaintiffs could not identify any individual "who took any of [her] utterances in a defamatory sense, e.g. believed the allegations and formed a negative opinion of the [plaintiffs] on that basis." The trial court denied the motion, noting that the plaintiffs "are not required to offer proof that anyone . . . believed what [the defendant] was saying (i.e. actual harm)," and that "the focus of the tort in this defamation per se case is on the conveyance of the false statement, not the effect on the listener." On appeal, the defendant argues that there was not "a scintilla of evidence that any individual took any of [her] utterances in a defamatory sense." Therefore, she contends, "because the [plaintiffs] failed to establish actual damages of reputational harm," the trial court erred in denying her motion for summary judgment and when it ruled on motions made at various junctures during and after trial. We are not persuaded.

It is well established in New Hampshire that no proof of specific damages is required "[w]hen . . . the jury could find that the defamatory publication charged the plaintiff with a crime or with activities which would tend to injure him in his trade or business, commonly called libel per se." Chagnon v. Union-Leader Co., 103 N.H. 426, 441 (1961); see Restatement (Second) of Torts § 570 (1977) (stating that "[o]ne who publishes matter defamatory to another in such

4

a manner as to make the publication a slander is subject to liability to the other although no special harm results if the publication imputes to the other . . . a criminal offense . . . , or . . . matter incompatible with his business, trade, profession, or office"); see also Lassonde v. Stanton, 157 N.H. 582, 592-93 (2008). Instead, the plaintiff "can recover as general damages all damages which would normally result from such a defamation, such as harm to his reputation." Chagnon, 103 N.H. at 441. The defamatory statements made by the defendant in this case include assertions that the plaintiffs are liars and sociopaths, have a deceptive rental business, attempted to kill her, engaged in witness tampering, stalked her, vandalized her property, drive drunk, use illegal drugs, and are alcoholics. Thus, the trial court did not err when it denied the defendant's motions.

### B. Actual Malice

The defendant next argues that the award of enhanced compensatory damages in a case of defamation per se requires proof of "actual malice." She contends that the "actual malice" standard set forth in New York Times Co. v. Sullivan, 376 U.S. 254 (1964), rather than the common law standard of "malice" articulated in Munson v. Raudonis, 118 N.H. 474 (1978), applies, and that the trial court erred in relying on the common law standard in its instructions to the jury.

If the plaintiff in a defamation case is a public official or public figure, he or she must prove that the statement was made with "actual malice," meaning "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." New York Times Co., 376 U.S. at 280. It is, however, axiomatic that, if the plaintiff is a private person, he or she "may recover compensatory damages upon a showing that the defendant was negligent in publishing a defamatory falsehood." McCusker, 121 N.H. at 260; see Duchesnaye, 125 N.H. at 251; Gertz v. Robert Welch, Inc., 418 U.S. 323, 344-45, 348-49 (1974) (explaining that because private persons have not voluntarily exposed themselves to increased risk of injury from defamatory statements and because they generally lack effective opportunities for rebutting such statements, States possess a "strong and legitimate . . . interest in compensating private individuals for injury to reputation"). Given that it is undisputed that the plaintiffs in this case are private persons, the New York Times "actual malice" standard does not apply. See Lassonde, 157 N.H. at 589 (explaining that "private plaintiffs can succeed in defamation actions on a state-set standard of proof (typically, negligence), whereas the Federal Constitution imposes a higher hurdle for public figures and requires them to prove actual malice" (quotation and brackets omitted)).

Nonetheless, the defendant contends that pursuant to Munson, a punitive damage claim in New Hampshire requires proof of actual malice. In Munson, we noted that a defendant may not be punished by being held liable

for punitive or exemplary damages; rather, a plaintiff is to be awarded compensatory damages only.  Munson, 118 N.H. at 478.  We further stated, however, that "when the act involved is wanton, malicious, or oppressive, the compensatory damages awarded may reflect the aggravating circumstances." Id. (quotation omitted).  This is just such a case.

The plaintiff in Munson argued that she did not have to prove that the defendant's conduct was wanton, malicious, or oppressive because "the mere allegation and proof of deceit trigger[ed] the application of the liberal rule of compensatory damages without further proof of malice because an act of deceit contains legal malice, i.e., the intentional doing of a wrongful act."  Id. at 479. We disagreed, reasoning that liberal compensatory damages are to be awarded only in exceptional cases and, if we were to agree with the plaintiff and hold that "malice" for the purpose of measuring damages is the intentional doing of a wrongful act, then every intentional tort would give rise to an increased measure of damages.  Id.  Accordingly, we determined that an award of damages must be based not on implied or legal malice but only on a showing of "actual malice," which we defined as meaning "ill will, hatred, hostility, or evil motive on the part of the defendant."  Id.

We disagree that, simply because Munson alludes to "actual malice," the legal standard articulated in Munson is the equivalent of the New York Times standard of "actual malice."  Rather, as the trial court properly instructed the jury, the plaintiffs may receive "enhanced damages or liberal compensatory damages" if the defendant's conduct "was more probably than not, wanton, malicious, or oppressive."  See Figlioli v. R.J. Moreau Cos., 151 N.H. 618, 621 (2005) ("When an act is wanton, malicious, or oppressive, the aggravating circumstances may be reflected in an award of enhanced compensatory damages.").  We find no error in the trial court's instructions to the jury.

C.  Public Concern

The defendant next argues that because the speech in this case concerned purported criminal activity, corruption in law enforcement, and threats to public safety, it constitutes speech of "public concern" protected under the First Amendment to the United States Constitution, thereby triggering a requirement that there be a finding of "actual malice," and heightened judicial review.  The defendant asserts that the trial court erred when it failed to instruct the jury in a manner consistent with these principles. We disagree.

"[S]peech on matters of public concern is at the heart of . . . First Amendment protection."  Dunn & Bradstreet, Inc. v. Greenmoss Builders, 472 U.S. 749, 758-59 (1985) (plurality opinion) (quotations omitted).  "The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."  Id. at 759

(quotations omitted). "In contrast, speech on matters of purely private concern is of less First Amendment concern." Id. "In such a case, there is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press." Id. at 759-60 (quotation and brackets omitted). Thus, "[i]n light of the reduced constitutional value of speech involving no matters of public concern," an award of enhanced compensatory damages even absent a showing of actual malice under the New York Times standard does not violate the First Amendment. See id. at 761.

"Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." Snyder v. Phelps, 562 U.S. 443, 453 (2011) (quotation omitted). The standard is met when the speech centers on "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." San Diego v. Roe, 543 U.S. 77, 83-84 (2004) (per curiam).

Determining whether a defamatory statement involves a matter of public concern requires examining the expression's "content, form, and context as revealed by the whole record." Id. at 83 (quotation omitted); see Levinsky's v. Wal-Mart Stores, Inc., 127 F.3d 122, 132 (1st Cir. 1997). Considering these factors on the record before us, we conclude that the speech in this case — comprised of unfounded, personal attacks against the plaintiffs, including allegations of "criminal activity" such as unpermitted fires, excessive noise, alcohol and drug use, and purported "threats to public safety" — involved solely matters of private concern. See Snyder, 562 U.S. at 455 (observing that "speech on public matters . . . intended to mask an attack . . . over a private matter" to "insulate speech on a private matter from liability" falls outside First Amendment protection). Such speech is "wholly false and clearly damaging" to the plaintiffs' reputation, and there is "simply no credible argument" that the defendant's speech "requires special protection to ensure that debate on public issues will be uninhibited, robust, and wide-open." Dunn, 472 U.S. at 762 (quotation and brackets omitted). Accordingly, the trial court did not err in its instructions to the jury.

III.  Rule 404(b) Evidence

The defendant next argues that the trial court erred "in admitting highly prejudicial [Rule] 404(b) evidence of the Defendant's conduct out-of-state which occurred months after the so-called 'defamation' in New Hampshire for purposes of proving common law malice at the time of the 'defamatory' statements," thus "necessitating a new trial." (Bolding and underlining omitted.) Specifically, the defendant points to evidence admitted at trial that she threatened an acquaintance of the plaintiffs in Massachusetts "with an ethical complaint if [the acquaintance] refused to sign an affidavit against" the

7

plaintiffs. According to the defendant, regardless of "whatever marginal relevance the evidence may have, it is further barred under Rule 403, as unfairly prejudicial" to her.

New Hampshire Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

For this evidence to be admissible under Rule 404(b), it must be relevant for a purpose other than proving a person's character or disposition; there must be clear proof that the person committed the act; and the probative value of the evidence must not be substantially outweighed by its unfair prejudice to the defendant. State v. Dow, 168 N.H. 492, 498 (2016). In addition, New Hampshire Rule of Evidence 403 permits the trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." N.H. R. Ev. 403.

We accord the trial court considerable deference in determining the admissibility of evidence, and we will not disturb its decision absent an unsustainable exercise of discretion. State v. Addison, 160 N.H. 493, 500 (2010). To demonstrate that the trial court unsustainably exercised its discretion, the defendant must show that the ruling was clearly untenable or unreasonable to the prejudice of her case. See id. at 501; see also Madeja v. MPB Corp, 149 N.H. 371, 390 (2003).

As set forth above, to receive an award of enhanced compensatory damages, the plaintiffs were required to prove that the defendant's conduct "was more probably than not, wanton, malicious, or oppressive." Figlioli, 151 N.H. at 621. The trial court instructed the jury that it could "consider an award of additional damages to reflect aggravating circumstances" if they found the defendant acted with "ill-will, hatred, hostility, or bad motive." Thus, rather than being evidence prohibited by Rule 404(b) of "other crimes, wrongs, or acts . . . to prove the character of [the defendant] in order to show that [she] acted in conformity therewith," the defendant's subsequent statements were admissible because they were highly relevant to proving the aggravating circumstances necessary to support an award of compensatory damages. Accordingly, we affirm the court's determination that the evidence was admissible as it was a sustainable exercise of discretion.

8

IV. Injunctive Relief

Next, the defendant argues that the trial court "erred in ordering the physical removal of [her] from her family's vacation property and in banishing [her] from Sterling, Massachusetts." (Bolding omitted.)

Following a hearing, the trial court issued a permanent injunction prohibiting the defendant from: contacting the plaintiffs or their family members either directly or indirectly; going within 500 feet of the plaintiffs; publishing through spoken word or writing, the accusations concerning the plaintiffs that the jury found to be defamatory; entering the plaintiffs' hometown in Sterling; and going within a five-mile radius of the plaintiffs' home in Fitzwilliam. On appeal, the defendant challenges the injunction only to the extent that it prohibits her from going within five miles of her family's vacation home in Fitzwilliam and entering Sterling.

The superior court "shall have the powers of a court of equity" in cases "in which there is not a plain, adequate and complete remedy at law," RSA 498:1 (2010), and the court "may grant writs of injunction whenever the same are necessary to prevent fraud or injustice," RSA 498:2 (2010). "The propriety of affording equitable relief rests in the sound discretion of the trial court to be exercised according to the circumstances and exigencies of the case." Found. for Seacoast Health v. Hosp. Corp. of America, 165 N.H. 168, 179 (2013) (quotation omitted). The court has broad and flexible equitable powers which allow it to shape and adjust the precise relief to the requirements of the particular situation. Benoit v. Cerasaro, 169 N.H. 10, 20 (2016). A court of equity will order to be done that which in fairness and good conscience ought to be or should have been done and it is the practice of courts of equity to administer all relief which the nature of the case and facts demand. Id.

We review the trial court's decision whether to grant equitable relief for an unsustainable exercise of discretion. Id. at 19. The party asserting that a trial court order is unsustainable must demonstrate that the ruling was unreasonable or untenable to the prejudice of her case. See id. at 20. In doing so, we determine whether the record establishes an objective basis sufficient to sustain the discretionary judgment made. Id.

The trial court found that the geographical restrictions it imposed were "appropriate because a less restrictive order would be ineffective." According to the court, the plaintiffs' "fear for their safety is a rational response to [the defendant's] relentless and increasingly intimidating behavior," and the defendant's "several threats" toward the plaintiffs provided a "compelling interest" for granting the injunction. Thus, the trial court reasoned that preventing the defendant from accessing her family's summer home in Fitzwilliam, "the epicenter from which all of [her] attacks have stemmed, [was] an appropriate, narrowly tailored restriction to address this interest."

9

The trial court further found that

> [the defendant] has more than demonstrated her belief that she has a right to harass the [plaintiffs] and that she has an absolute fixation on the victims. She has published defamatory, false materials; contacted numerous federal and state authorities to report these falsities; threatened the [plaintiffs'] lives; and travelled to the [plaintiffs'] hometown in Massachusetts to solicit signatures to support her false and extreme accusations. [The defendant] has also given the Court no indication that she will abide by a more narrow court order, and she has shown no contrition for any of her actions—actions that were defamatory, threatening, and even criminal, as she was arrested for impersonating an agent of the New Hampshire Attorney General a week before trial and yet testified during the defamation case that she was such an agent. Even when the defamation case was approaching trial, and even with standing orders from this Court to refrain from harassing the [plaintiffs], [the defendant] published more defamatory material. [The defendant's] increasingly threatening actions and her failure to follow previous court orders make geographical banishments necessary.
>
> [The defendant] has harassed the [plaintiffs] . . . for no apparent reason and they have been driven to desperation by continuous harassment. . . . These innocent victims deserve to be able to live their lives free from the constant fear of being tormented and attacked. The geographic restriction . . . will provide them with a margin of territorial safety in which they can live in peace. This Court also considered the fact that the [Fitzwilliam] property, where [the defendant] has occasionally resided, is not a year-round residence, and that [the defendant] was not at the residence during the summer months of 2017. . . . [The defendant], therefore, would not have her liberty and right to travel overly burdened by the five-mile restriction around the [plaintiffs'] Fitzwilliam residence. Similarly, since [the defendant] is not a resident of Sterling, and has not evidenced reasons to visit Sterling other than to garner signatures for her false affidavits implicating the [plaintiffs], preventing her from entering Sterling would not unconstitutionally constrict her right to travel.

(Quotations, citations, brackets, and ellipses omitted.) Accordingly, the trial court concluded that the two geographical restrictions "are reasonably related and narrowly tailored to [the defendant's] potential, and likely, targeting of the [plaintiffs]."

10

To the extent the defendant challenges the injunction because there was insufficient evidence for the trial court to conclude that she presents a danger to others, we disagree. The trial court relied upon evidence that the defendant sent a letter to several state and federal authorities, including the Boston, Massachusetts office of the Federal Bureau of Investigation (FBI), stating that she had "been having fears of homicidal ideation of having to be put in the position of killing the [plaintiffs] and or their drunken tenants." The trial court also found that in her letter to the FBI the defendant stated that she had considered hiring a federal contractor "with an assault weapon to try to protect [her] to help [her] calm down" when she was at the house in Fitzwilliam, that "issues between neighbors blossom to the point until someday one neighbor gets a gun and shoots the other neighbor," and that she had "thought about getting a gun." Based upon this evidence, the trial court found that the defendant is "irrational and quite capable of inflicting harm – both physical and emotional" on the plaintiffs, that she believes she is a "surrogate" of multiple law enforcement agencies, including the New Hampshire Attorney General and the New Hampshire State Police, and that "[i]t is quite rational to conclude that she could convince herself – as a self-proclaimed law enforcement agent – to arm herself," which would be a "disastrous, but foreseeable, result." Thus, there is ample support in the record to support the trial court's determination that the defendant presents a danger to others.

We also reject the defendant's argument that the injunction, by "restricting [her] freedom," is "illegal" because it "does not reflect comity with Massachusetts." This argument mischaracterizes the extent of the ordered relief: the injunction does not interfere with any legislative, executive, or judicial acts undertaken by the government of the Commonwealth of Massachusetts. See Black's Law Dictionary 324 (10th ed. 2014) (defining "comity" as "[a] practice among political entities (as countries, states, or courts of different jurisdictions), involving esp. mutual recognition of legislative, executive, and judicial acts"). Rather, in imposing restrictions on the defendant that reflect "the precise relief" necessitated by the "particular situation," Benoit, 169 N.H. at 20, the trial court properly exercised its equity powers. See Steele v. Bulova Watch Co., 344 U.S. 280, 289 (1952) (noting that a court "in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction"); United States v. AMC Entertainment, Inc., 549 F.3d 760, 770 (9th Cir. 2008) (explaining that "[o]nce a court has obtained personal jurisdiction over a defendant, the court has the power to enforce the terms of the injunction outside the territorial jurisdiction of the court"). Accordingly, we conclude that the trial court's decision was not an unsustainable exercise of discretion.

Finally, to the extent that the defendant argues that the injunction unconstitutionally restricts her freedom of travel, she has failed to develop this argument sufficiently for our review. As we have explained, "Judicial review is not warranted for complaints regarding adverse rulings without developed legal

11

argument, and neither passing reference to constitutional claims nor off-hand invocations of constitutional rights without support by legal argument or authority warrants extended consideration." <u>Lennartz v. Oak Point Assocs.</u>, 167 N.H. 459, 464 (2015) (quotation omitted).

<u>Affirmed</u>.

     LYNN, C.J., and HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.